IN THE SUPERIOR COURT
OF THE VIRGIN ISLANDS

FILED
May 19, 2021
SX-2021-CV-00411
TAMARA CHARLES
CLERK OF THE COURT

IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| Helen Shirley, Anisha Hendricks, Cristel Rodriguez, Josie Barnes, Arleen Miller, and Rosalba Estevez, Isidore Jules, John Sonson, and Virginie George, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>Limetree Bay Ventures, LLC, Limetree Bay Terminals, LLC, and Limetree Bay Refining, LLC,<br><br>*Defendants*. | Case No. SX-21-CV-_____<br><br>Jury Trial Demanded<br><br>Putative Class Action |

## COMPLAINT

Plaintiffs, on behalf of themselves and all other similarly situated, hereby bring suit against the defendants Limetree Bay Ventures, LLC ("LBV"), Limetree Bay Refining, LLC ("LBR"), and Limetree Bay Terminals, LLC ("LBT") (collectively "Limetree") alleging as follows:

1. Limetree owns and operates the former HOVENSA refinery. In its attempts to prematurely restart a facility that had been idled for nearly a decade, Limetree caused tons of airborne chemical emissions to be emitted downwind in the neighboring communities on the west end of St. Croix.

2. Among the toxicants emitted were sulfur dioxide (SO2), sulfur oxides (SOx), particulate matter (PM), and oil droplets – all of which are harmful to human health.

3. Exposure to airborne toxicants from industrial sources can cause acute and latent diseases and illness. Symptoms of coughing and shortness of breath are immediate and obvious, but some consequences like cancer take decades or more to manifest.

4. Plaintiffs include individuals who resided, stayed, or traveled to the west end of St.

Croix and were exposed to Defendants' emissions of sulfur dioxide and other noxious fumes. They seek the creation of a medical monitoring program whereby they and others like them who were exposed can receive routine medical testing and physician-visits to ensure that their health does not suffer as a result of Limetree's actions.

5. Early disease detection is crucial. A robust medical monitoring program can improve health outcomes by ensuring that exposed persons are routinely assessed by appropriately trained medical professionals who are equipped with the necessary diagnostic and screening tools, and who are well positioned to assess exposed persons' health outcomes over time.

6. Knowledge is power. If an exposed person remains well, the screening affords peace of mind. But if an exposed person's health deteriorates, the early screening will assist in swift diagnosis, medical intervention, and treatment.

7. The costs of this screening and detection should not be borne by the innocent. Defendants created and emitted the pollution; they should make it right.

8. Exposure to toxicants is more than just harmful – it's a nuisance. Homeowners on the west-end of the island have had to live with the noxious smells. Sulfur dioxide, for example, smells like rotten eggs.

9. Homeowners on St. Croix have a right to enjoy their property. Defendants' emissions have disrupted that use and enjoyment for many homeowners downwind of the oil refinery. Those homeowners affected are entitled to compensation for their trouble.

### Jurisdiction & Venue

10. This Court has subject matter jurisdiction over this action pursuant to 4 V.I.C. § 76.

11. Venue is proper under 4 V.I.C. § 78.

### Parties

12. Plaintiff Helen Shirley is a citizen of the U.S. Virgin Islands and a resident of St. Croix.

13. Plaintiff Anisha Hendricks is a citizen of the U.S. Virgin Islands and a resident of St. Croix.

14. Plaintiff Cristel Rodriguez is a citizen of the U.S. Virgin Islands and a resident of St. Croix.

15. Plaintiff Josie Barnes is a citizen and resident of Texas.

16. Plaintiff Arleen Miller is a citizen and resident of Colorado.

17. Plaintiff Rosalba Estevez is a citizen and resident of New Jersey.

18. Plaintiff John Sonson is a citizen of the U.S. Virgin Islands and a resident of St. Croix.

19. Plaintiff Isidore Jules is a citizen of the U.S. Virgin Islands and a resident of St. Croix.

20. Plaintiff Virginie George is a citizen and resident of Texas.

21. Defendant Limetree Bay Ventures, LLC ("LBV") is organized under the laws of the Delaware and was doing business in the Virgin Islands at all times relevant to this action. LBV's members include members residing in one or more of Texas, Colorado, and/or New Jersey.

22. Defendant Limetree Bay Terminals, LLC ("LBT") is organized under the laws of the Virgin Islands and was doing business in the Virgin Islands at all times relevant to this action. LBT's members include members residing in one or more of Texas, Colorado, and/or New Jersey.

23. Defendant Limetree Bay Refining, LLC ("LBR") is organized under the laws of the Virgin Islands and was doing business in the Virgin Islands at all times relevant to this action. LBV, LBT, and LBR will be referred to collectively as "Limetree." LBV's members include members residing in one or more of Texas, Colorado, and/or New Jersey.

### Factual Background

24. Limetree Bay Ventures, LLC ("LBV") is the parent company of Limetree Bay Terminals, LLC ("LBT") and Limetree Bay Refining, LLC ("LBR"). LBT is the owner and/or operator of the refinery, and LBR is the owner and/or operator of the entire facility (which includes

a marine loading terminal and an integrated petroleum refinery), including the refinery operations.

25. Limetree began the restart of the refinery in 2018 with the intention of tapping into a rising demand for low-sulfur fuels in Latin America and the Caribbean.

26. But the restart of the refinery ran significantly behind schedule.

27. The delay in restarting the refinery threatened Limetree's financial viability. For instance news reports in late 2020 indicated that BP, which had entered into an agreement with Limetree to supply it crude and market the fuels, was considering withdrawing from the agreement.[1]

28. On February 1, 2021 Limetree announced that refinery operations had resumed and that Limetree had begun production and commercial sales of refined products.

29. Since February of 2020, the refinery has experienced several major mishaps resulting in significant airborne chemical emissions and oil releases.

30. During this period, residents in surrounding neighborhoods have complained on multiple occasions about an oily residue that rained on their properties.

31. Residents in the surrounding neighborhoods have also complained of an unsettling odor causing them to become ill.

32. On April 24, 2021, The Virgin Islands Department of Health issued a press release to the community warning of potential health effects from the refinery's emissions. The press release noted that Limetree had confirmed elevated concentrations of hydrogen sulfide and encouraged residents to report symptoms.[2]

33. The DPNR has investigated the odor complaints and found "an exceedance of

---

[1] *See* Sanicola, L., *Exclusive: BP May Cut Oil Supply to Caribbean refinery if it Stays Idle – Sources*, Reuters (Oct. 16, 2020), https://www.reuters.com/article/uk-usa-refinery-limetree-bay-startup-exc-idUKKBN2710MD.

[2] *See VI Government Alerts St. Croix Residents about Potential Health Effects Caused by Refinery Emissions*, V.I. Dep't of Health (Apr. 26, 2021), https://doh.vi.gov/news/vi-government-alerts-st-croix-residents-about-potential-health-effects-caused-refinery.

Hydrogen sulfide" in the vicinity of the refinery.[3]

34. Limetree has been operating the refinery without sulfur dioxide monitors, which prevents Limetree from tracking the amount of sulfur dioxide it emits to the surrounding communities.

35. Members of the neighboring communities have been subjected to a foul odor that has caused them to experience headaches, coughing, nausea, and other symptoms.

36. The odor was so severe that the Virgin Islands Department of Education closed three schools for multiple days.

37. Limetree has indicated that it is investigating whether maintenance activity in the coker unit is the cause of the emissions.

38. Fires within the refinery have also been reported which have caused liquid droplets of oil to rain down on neighboring properties.

39. While living in the vicinity of the refinery, the Plaintiffs and the Class Members were routinely exposed to sulfur dioxide, particulate matter, and other toxicants.

### Consequences of Exposures

40. The Virgin Islands Department of Planning and Natural Resources has warned that: "Exposure to low concentrations of hydrogen sulfide may cause irritation to the eyes, nose, or throat. It may also cause difficulty in breathing for some asthmatics. Respiratory distress or arrest has been observed in people exposed to very high concentrations of hydrogen sulfide. Exposure to low concentrations of hydrogen sulfide may cause headaches, poor memory, tiredness, and balance problems. Brief exposures to high concentrations of hydrogen sulfide can cause loss of consciousness.

---

[3] *See Did Toxic Gas Emitted from Limetree Bay Refinery Exceed Permitted Levels? EPA Investigating Plant's Exceedence; Level,* VI Free Press (Apr. 23, 2021), https://vifreepress.com/2021/04/did-toxic-gas-released-from-limetree-bay-refinery-exceed-permitted-levels-dpnr/.

In most cases, the person appears to regain consciousness without any other effects. However, in some individuals, there may be permanent or long-term effects such as headaches, poor attention span, poor memory, and poor motor function. Individuals with respiratory ailments such as allergies, lung disease, or asthma should consider taking protective actions such as staying indoors or temporarily relocating to areas less affected."[4]

41. "Long-term studies surveying large numbers of children have indicated possible associations between sulfur dioxide pollution and respiratory symptoms or reduced breathing ability. Children who have breathed sulfur dioxide pollution may develop more breathing problems as they get older, may make more emergency room visits for treatment of wheezing fits, and may get more respiratory illnesses than is typical for children."[5]

42. "It is known that exercising asthmatics are sensitive to low concentrations of sulfur dioxide. Therefore, increased susceptibility is expected in children with asthma, but it is not known whether asthmatic children are more sensitive than asthmatic adults. Additionally, asthma occurs most often in African Americans, children between the ages of 8 and 11, and people living in cities. For unknown reasons, the death rates associated with asthma are also higher in non-Caucasian people. Therefore, it is expected that asthmatic, African American children living in urban areas have increased sensitivity to sulfur dioxide."[6]

43. "A highly reactive colorless gas smelling like rotten eggs, sulfur dioxide derives primarily from fossil fuel combustion. Best known for causing 'acid rain,' at elevated concentrations in the ambient air, $SO_2$ also directly impairs human health. As the Administrator explains in the Final

---

[4] *See* Clean Air Act Emergency Order, United States Environmental Protection Agency, Region 2 ("EPA Order") (May 14, 2021) https://www.epa.gov/sites/production/files/2021-05/documents/limetree_bay_303_order_-_caa-02-2021-1003.pdf, at ¶95.

[5] EPA Order at ¶102 (quoting public statement by Agency for Toxic Substances and Disease Registry).

[6] *Id.*

Decision on review here, $SO_2$ can affect healthy non-asthmatic individuals at concentrations above 2.0 parts per million ("ppm"); below 2.0 ppm, it primarily affects people with asthma. *National Ambient Air Quality Standards for Sulfur Oxides (Sulfur Dioxide)-Final Decision*, 61 Fed.Reg. 25,566, 25,570 (1996)." *Am. Lung Ass'n v. E.P.A.*, 134 F.3d 388, 389 (D.C. Cir. 1998).

44. "Sulfur dioxide induces bronchoconstriction in asthmatics, but only under certain conditions. To experience adverse effects from $SO_2$ concentrations below 1.0 ppm, asthmatics must be exposed for five minutes or longer while breathing quickly and heavily through both nose and mouth, the sort of breathing induced by light exercise, shoveling snow, climbing several flights of stairs, or jogging to catch a bus. At concentrations above 2.0 ppm, $SO_2$ causes adverse effects even if the exposure lasts less than five minutes or the asthmatic breathes regularly. *See* Second Addendum to Air Quality Criteria for Particulate Matter and Sulfur Oxides (1982): Assessment of Newly Available Health Effects Information (1986)." *Id.* at 390.

45. A contractor investigating the refinery on St. Croix stated the following regarding two of the oil-droplet releases from the facility: ". . . the oil [released during the Feb. 4 Incident and the Second May Incident] is likely composed of a mixture of petroleum hydrocarbons. Potential exposures include inhalation of volatile components, dermal contact with the residues, and ingestion of or contact with impacted water. Human health impacts depend on the specific petroleum constituents in a particular media or matrix, but total petroleum hydrocarbons as well as individual constituents have been associated with a variety of adverse health impacts. Skin and eye irritation, for example, are associated with short-term exposures to different hydrocarbon fractions. Longer term oral exposures to the semi-volatile fractions such as polyaromatic hydrocarbons (PAHs) have shown liver effects to be a common endpoint. Dermal contact with some PAHs have been shown to elicit skin hypersensitivity reactions. Some oil constituents have been classified as known or possible

carcinogens."[7]

46. The contractor continued: "[I]n addition to the impacts on physical health, the repeated incidents emitting oil droplets in a short time period have resulted in fear and anxiety about the next possible event and the severity of that event. The frequency of Limetree flare incidents raises the concern that events could continue to escalate and result in an even more significant or catastrophic incident, which could lead to injury or loss of life. The contractor also notes that improper maintenance or process safety management of flare systems has historically caused serious harm to people (killing or injuring workers and people living and working off site) and the environment, as well as damage and loss to property."[8]

### Allegations of the Plaintiffs

47. Plaintiff Helen Shirley resides at 340 Barron Spot, St. Croix.

48. Plaintiff Shirley was exposed to the pollution released by the oil refinery. She experienced headaches, shortness of breath, nausea, and went to the doctor for her symptoms.

49. Plaintiff Shirley sits on a community board that meets with Limetree representatives on a regular basis regarding their impact on the community. Limetree representatives informed her prior to the releases that the refinery had monitors in order to measure what was being released. In fact, Limetree had no such functioning sulfur dioxide monitors.

50. Plaintiff Anisha Hendricks resides at 90 Williams Delight, St. Croix.

51. Plaintiff Hendricks was exposed to the toxicants released by the oil refinery. She experienced headaches, vomiting, burning eyes and a burning sensation of the tongue and had to go to Urgent Care.

52. Plaintiff Hendricks' daughter was exposed to the toxicants released by the oil

---

[7] EPA Order at ¶104.

[8] *Id.*

refinery. She experienced headaches and vomiting, and was sent to her grandparents' home.

53. Plaintiff Cristel Rodriguez resides at #5E Estate La Grange, St. Croix.

54. Plaintiff Rodriguez was exposed to the toxicants released by the refinery. She experienced asthma and severe allergic reactions. She experienced severe headaches, coughing, dizzy spells, burning of the eyes, nose and throat, difficulty breathing, chest pains, stomach pain, weakness and vomiting.

55. Plaintiff Josie Barnes was born on St. Croix but has lived in Texas for approximately ten years and intends to continue residing in Texas.

56. Plaintiff Barnes traveled to St. Croix from Texas to visit friends and family during the Class Period. Plaintiff Barnes traveled to St. Croix with her adult daughter and her grandson.

57. Plaintiff Barnes spent significant time during the trip visiting her friend and her sister in Estate Whim.

58. While on St. Croix, Plaintiff Barnes was exposed to the pollution released by the oil refinery. She was exposed to the foul odor which caused her to become dizzy and suffer headaches.

59. Plaintiff Barnes went to a physician after returning to Texas and was diagnosed with an upper respiratory infection.

60. Plaintiff Arleen Miller was born on St. Croix, but has lived in Colorado for approximately twenty years and intends to continue residing in Colorado.

61. Plaintiff Miller traveled to St. Croix to visit family and stayed in Estate Whim during the Class Period.

62. While on St. Croix, Plaintiff Miller was exposed to the toxicants released by the oil refinery. She was exposed to the sulfur-like odor that caused her to experience a headache, burning throat, and nausea, and which exacerbated her allergies.

63. After Plaintiff Miller returned home, she initially continued to feel ill. Plaintiff Miller

still experiences mild headaches.

64. Plaintiff Rosalba Estevez was born in the Dominican Republic but has resided in New Jersey for more than ten years.

65. Plaintiff Estevez traveled to St. Croix to visit family members during the Class Period.

66. While on St. Croix, Plaintiff Estevez was exposed to the toxicants released by the oil refinery. She was exposed to an intense and disturbing odor which caused her to experience headaches, stomach pain, burning eyes, and a feeling of faintness.

67. Plaintiff Estevez cut her trip short because of the odor and because of her symptoms in order to meet with a physician.

68. Isidore Jules is the owner of 99-F Estate Whim, St. Croix.

69. Throughout April and May 2021, the smell from Limetree was particularly strong at Mr. Jules's residence. The smell was pervasive through his neighborhood, and downwind into Campo Rico.

70. As a result of the strong sulfur odor, Mr. Jules was disturbed in the use and enjoyment of his property. He could not stand to be outside on his porch or in his garden or to work in the yard, and he could not escape the smell inside his residence either.

71. John Sonson is the owner of 259 Estate Grove Place, St. Croix.

72. Throughout April and May 2021, the smell was also similarly strong at Mr. Sonson's residence. As a result of the strong sulfur odor, Mr. Sonson was disturbed in the use and enjoyment of his property.

73. The smell caused Mr. Sonson respiratory distress when he was on his front porch or in his yard. He attempted to escape from the smell by going inside, but found that the AC intake only brought in the foul-smelling odors.

74. Virginie George is the owner of 43, 43A, and 43AB Cane Carlton, St. Croix. He

previously worked at HOVENSA, but moved to the states for work. He resides, votes, and has a driver's license in Texas.

75. Mr. George stayed at his V.I. property from April 19 to May 5, 2021, on a trip from Texas. He read the newspaper articles on the toxicants that were being emitted from Limetree. At the same time, he sensed that "something in the air wasn't right." While he doesn't recall a specific odor, he received numerous complaints from his tenants and neighbors about them. He recently received a call from Limetree informing him that his property has been contaminated by oil droplets. As a result of Limetree's Mr. George was disturbed in the use and enjoyment of his property.

### Class Allegations

76. Plaintiffs seek the certification of two classes:

 a. **Medical Monitoring Class**: All persons who were exposed to sulfur dioxide, particulate matter, oil droplets, or other polluting substance emitted from the oil refinery operated by Limetree from February 1, 2021 to present.

 b. **Homeowner Class**: All persons who own real property on St. Croix that were subjected to sulfur dioxide, sulfur oxides, particulate matter, oil droplets, or other polluting substance emitted from the oil refinery operated by Limetree from February 1, 2021 to present.

77. Excluded from this definition are Defendants and their officers, directors, management, employees, subsidiaries, and affiliates, and any federal, state, territorial, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

78. Also excluded from this definition are non-Virgin Island-citizen employees of contractors working at the refinery during the Class Period.

79. Certification of the Plaintiffs' claims for class-wide treatment is appropriate because

the Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence that would be used to prove those elements in individual actions alleging the same claims.

80. Numerosity: The members of the Class are so numerous that individual joinder of all Class members is impracticable. The Class includes hundreds, if not thousands, of residents of the Virgin Islands in the neighboring communities surrounding the refinery who were exposed to the toxicants or own real property. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

81. Commonality: This action involves common questions of law and fact. Common issues include the fact that all class members were exposed to toxic and hazardous substances emitted from Limetree. Common issues of law include whether the Defendants failed to adequately control for pollution emissions at the oil refinery, and failed to take appropriate environmental and health precautions regarding re-starting an idled oil refinery. For the Medical Monitoring Class, a common issue is whether members of have a substantially increased likelihood of developing certain signature diseases. And for the Homeowner Class, a common issue will be whether an objective observer would find the odors unreasonably interfere with the use and enjoyment of real property, and if so, the measure of those damages.

82. Typicality: Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform misconduct described above. Plaintiffs and the members of the Class have suffered the same injury, *i.e.*, (i) an increased risk of developing a pollution-induced disease, and would similarly benefit from a robust monitoring program to screen for disease and facilitate early intervention to improve health outcomes; and (ii) damages from diminished use and enjoyment of their real property.

83. Adequacy of Representation: Plaintiffs are adequate representatives of the Class

because their interests do not conflict with the interests of the other Class members they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and the Plaintiffs intend to prosecute this action vigorously. The Class's interest will be fairly and adequately protected by the Plaintiffs and their counsel.

## Count 1 – Medical Monitoring

84. Plaintiffs Helen Shirley, Anisha Hendricks, Cristel Rodriguez, Josie Barnes, Arleen Miller, Rosalba Estevez, and John Sonson bring this claim for relief on behalf of themselves and the Medical Monitoring Class.

85. Class Members were exposed to known hazardous substances through the actions of the Defendants. In particular, they were exposed to high levels of sulfur dioxide (SO2), sulfur oxides (SOx), and particulate matter (PM).

86. Because of these exposures, Plaintiffs and the Class Members have an increased risk of contracting serious latent diseases.

87. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

88. Monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

89. Accordingly, because of the increased risk of developing diseases and/or suffering from worsened conditions. Plaintiffs and the Class Members seek injunctive relief from the Court providing the Plaintiffs and the Class Members with an adequately-funded Court-supervised and administered surveillance program to:

   a. implement an outreach program to notify class members of the availability and benefits of the program;

   b. provide the Plaintiffs and Class Members with information so that they might

exercise informed consent to take advantage of the program;

  c.  provide routine screenings to Class Members;

  d.  provide information and results of the screenings to each screened Plaintiffs and Class Member;

  e.  award counsel reasonable attorney fees and other expenses associated with the prosecution of this action and the administration of the program;

  f.  keep proper records respecting the outcome of the screening program; and

  g.  provide for all administrative expenses associated with the establishing the eligibility of any Class Member for this program.

90. Plaintiffs do not seek damages for personal injury by present action, and expressly reserve same to be brought in separate actions.

## Count 2 – Negligence

91. Plaintiffs Helen Shirley, Anisha Hendricks, Cristel Rodriguez, Josie Barnes, Arleen Miller, Rosalba Estevez, and John Sonson bring this claim for relief on behalf of themselves and the Medical Monitoring Class.

92. Limetree foresaw that emitting pollution from the oil refinery – including sulfur dioxide, particulate matter, and oil droplets – could come into contact with Plaintiffs and members of the Class.

93. It similarly foresaw that exposed persons were at a significantly increased risk of developing a serious medical condition, ranging from asthma to cancer. And it foresaw that those in the community with pre-existing conditions – like COPD – stood to deteriorate in health.

94. Limetree failed to exercise reasonable care in the face of that foreseeable risk.

95. As relief, Plaintiffs seek injunctive relief in the form of medical monitoring in the form articulated in Count 1.

96.     Plaintiffs do not seek damages for personal injury by present action, and expressly reserve same to be brought by separate action(s).

## Count 3 – Private Nuisance

97.     Plaintiffs Isidore Jules, John Sonson, and Virginie George bring this claim for relief on behalf of themselves and the Landowner Class.

98.     Plaintiff seek relief pursuant to 28 V.I.C. § 331 and the common law of the Virgin Islands, in as much as the Defendants have substantially and unreasonably interfered with their and the Homeowner Class's interests in the private use and enjoyment of their real and personal property.

99.     The gravity of the harm alleged herein outweighs the utility of the Defendants' conduct. Plaintiffs' use and enjoyment of their property is well-suited to the character of locality. Controls are available that can eliminate or substantially reduce the refinery's emissions at reasonable expense. Defendants are not compensating Plaintiffs for their interference with his property, and the financial burden of compensating for the harms caused by the refinery emissions would not render it unfeasible for Limetree to continue operating the facility.

100.    As relief, Plaintiffs and the Landowner Class seek damages for the value of their loss of use and enjoyment of their real property.

## Jury Demand

101.    Plaintiffs are entitled to, and demands, a jury trial for all issues so triable.

*****

**WHEREFORE**, the Plaintiffs and Class Members pray the Court:

a.      Certify the proposed Medical Monitoring Class;

b.      Grant Plaintiffs Helen Shirley, Anisha Hendricks, Cristel Rodriguez, Josie Barnes, Arleen Miller, Rosalba Estevez, and John Sonson, and the Medical Monitoring Class injunctive relief in the form of Court-supervised surveillance program;

    c.    Certify the proposed Landowner Class;

    d.    Award Plaintiffs Isidore Jules, John Sonson, and Virginie George and the Landowner Class the damages they sustained for the loss of use and enjoyment of their real property;

    e.    Award Plaintiffs and the Class Members all costs and reasonable attorney fees and expenses; and

    f.    Provide for such other and further relief in favor of Plaintiffs and the Class Members as is just and equitable.

**DATED**: May 19, 2021                    Respectfully Submitted,


/s/ Warren T. Burns

Korey A. Nelson, Esq.
C. Jacob Gower, Esq.
H. Rick Yelton, Esq.
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Fax: (504) 881-1765
knelson@burnscharest.com
jgower@burnscharest.com
ryelton@burnscharest.com
mhenry@burnscharest.com

Warren T. Burns, Esq.
Daniel H. Charest, Esq.
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
dcharest@burnscharest.com

Vincent Colianni, II, Esq.
Vincent A. Colianni, Esq.
Marina Leonard, Esq.
**COLIANNI & COLIANNI**
2120 Company Street
Christiansted, VI 00820
Telephone: (340) 719-1766
Facsimile: (340) 719-1770
mailbox@colianni.com

J. Russell B. Pate, Esq.
**THE PATE LAW FIRM**
P.O. Box 370
Christiansted, VI 00821
Telephone: (340) 777-7283
Facsimile: (888) 889-1132
pate@sunlawvi.com