**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| **CLIFFORD BOYNES, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 2021-0253** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| | ) | |
| **HELEN SHIRLEY, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 2021-0259** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| | ) | |
| **MARY L. MOORHEAD, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 2021-0260** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| | ) | |
| **BEECHER COTTON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 2021-0261** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

**Lewis, Senior District Judge**

THIS MATTER comes before the Court on Defendants Limetree Bay Terminals, LLC ("LBT") and Limetree Bay Refining, LLC's ("LBR") (together, "Moving Defendants"[1]) "Joint Emergency Motion to Stay" ("Motion") (Dkt. No. 1298)[2] and Plaintiffs'[3] "Unopposed Motion and Incorporated Memorandum for Expedited Consideration of [Joint] Emergency [] Motion to Stay" ("Motion to Expedite") (Dkt. No. 1323).  In their Motion, Moving Defendants seek an Order "staying this litigation until May 30, 2026," on the grounds that an alleged "criminal investigation" for the same events underlying this litigation "deprives" Moving Defendants "of the ability and right to present a substantive defense to the claims" asserted in this litigation.  (Dkt. No. 1298 at 1-2).  Moving Defendants state that May 30, 2026 is the "anticipated date that the statute of limitations arising out of the events at the Limetree Bay Refinery between February and May of 2021" is "expected to run."  (Dkt. No. 1301 at 1).

Moving Defendants filed a "Memorandum in Support of Emergency Joint Motion to Stay" (Dkt. No. 1301), and Plaintiffs filed an "Opposition to Emergency Joint Motion to Stay" (Dkt. No. 1322).  Thereafter, Moving Defendants filed a "Local Rule 7.1(b) Submission" (Dkt. No. 1326) and a "Reply Memorandum in Support of Joint Emergency Motion to Stay" ("Reply") (Dkt. No.

---

[1] While EIG Global Energy Partners, LLC ("EIG") and Limetree Bay Ventures, LLC ("LBV") initially joined in the Motion (Dkt. No. 1298 at 1), EIG and LBV later withdrew from the Motion (Dkt. No. 1414 at 1).  Accordingly, EIG and LBV are not included as Moving Defendants.

[2] All docket numbers, unless noted otherwise, refer to the designated lead docket for the consolidated action, *Boynes v. Limetree*, No. 21-cv-0253.  (Dkt. No. 526 at 3, n.2).

[3] Plaintiffs are: Clifford Boynes, Margaret Thompson, Delia Almestica, Edna Santiago, Guidrycia Wells, Mary Moorhead, Sirdrina Isaac-Joseph, Esther Clifford, Alvina Jean-Marie Ilarraza, Ryan Alleyne, Agnes Augustus, Helen Shirley, Cristel Rodriguez, John Sonson, Isidore Jules, Virginie George, and minor child "O.N.", individually and on behalf of all others similarly situated.

1330).  Finally, Plaintiffs filed a "Notice of Supplemental Information" ("Notice") (Dkt. No. 1381); a second "Notice of Supplemental Information" ("Second Notice") (Dkt. No. 1525); and a "Notice of Withdrawal" (Dkt. No. 1529) related to their Second Notice.

For the reasons discussed below, the Court will deny Moving Defendants' Motion to Stay and deny as moot Plaintiffs' Motion to Expedite.

## I.    BACKGROUND

The background and history of this matter has been covered extensively by various Memorandum Opinions by this Court and the Third Circuit in this matter.  *See, e.g.*, *Boynes v. Limetree Bay Ventures, LLC*, 2025 WL 2097262 at *2 (D.V.I. July 25, 2025) (Dkt. No. 1316); *Boynes v. Limetree Bay Ventures, LLC*, 2024 WL 898245 at *1-3 (D.V.I. Mar. 1, 2024) (Dkt. No. 527); *Boynes v. Limetree Bay Ventures, LLC*, 2023 WL 4637319 at *1-2 (D.V.I. July 20, 2023) (Dkt. No. 389), *aff'd*, 110 F.4th 604 (3d Cir. 2024); *Boynes v. Limetree Bay Ventures, LLC*, 2023 WL 3166603 at *1-3 (D.V.I. Apr. 28, 2023) (Dkt. No. 285); *Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 604, 608-09 (3d Cir. 2024).  Thus, the Court recites only the facts necessary for resolution of the issue currently presented.

### A.    Deponents' Invocations of the Fifth Amendment

Central to the issue before the Court is the invocation by certain non-party deponents of their privilege against self-incrimination, which Moving Defendants argue prevents them from presenting a substantive defense to the claims asserted against them.  (Dkt. No. 1301 at 2).  Plaintiffs maintain that a stay of proceedings pending the expiration of the statute of limitations in a yet-to-be-filed criminal matter is not warranted under the circumstances here.  (Dkt. No. 1322 at 2).

Plaintiffs represent that they first identified Jeffrey Rinker ("Rinker"), the former President and CEO of LBV, LBR, and LBT, to Moving Defendants as a fact witness "at least as early as October 2024." *Id.* at 5. After several reschedulings of Rinker's deposition in 2024 and 2025, Rinker's deposition date was finalized as July 16, 2025. *Id.* at 5-7. On July 9, 2025, Rinker's counsel informed Plaintiffs that he would be asserting his rights under the Fifth Amendment to the Constitution and would not answer "any questions." *Id.* at 7-8. On July 15, 2025, Rinker filed a motion for a protective order in the Southern District of Texas, and informed Plaintiffs that he would not be appearing at his scheduled deposition the following day. *Id.* at 8. Plaintiffs' counsel attended the deposition to memorialize Rinker's absence. *Id.* at 9. Moving Defendants represent that Rinker is "a pivotal witness whose testimony is necessary for Movers' defense of this litigation" due to "his former positions with LBV, LBR, and LBT." (Dkt. No. 1301 at 3).

In addition to Rinker, the former Refinery General Manager Mr. Robert Weldzius ("Weldzius"), an individual whose deposition is sought by Plaintiffs, confirmed through counsel on July 14, 2025, that Weldzius would invoke his Fifth Amendment privilege if deposed. (Dkt. No. 1301 at 3). Moving Defendants represent that Weldzius is "uniquely qualified to provide testimony critical" to their defense in this matter. *Id.* at 3-4. Moving Defendants further state that "[b]ased on information and belief, there are other former high-level personnel of LBV, LBR, and/or LBT who have individually retained counsel that intend to invoke their Fifth Amendment rights should Plaintiffs seek to depose them." *Id.* at 4. Indeed, on August 1, 2025, counsel for Mr. Fermin Rodriguez ("Rodriguez"), an individual whose deposition is sought by Plaintiffs, confirmed that Rodriguez would invoke his Fifth Amendment privilege. (Dkt. No. 1326 at 2).

However, in a turn of events on August 25, 2025, Rinker moved to dismiss his motion for a protective order filed in the Southern District of Texas. (Dkt. No. 1381 at 2). Rinker confirmed

to Plaintiffs that he will move forward with his deposition, will not invoke the Fifth Amendment, and "will testify substantively" at his deposition.  *Id.*  Accordingly, on October 23, 2025, Plaintiffs' Second Notice (Dkt. No. 1525) informed the Court that Rinker was deposed on September 9, 2025; that Rinker testified substantively; and that Rinker did not invoke his Fifth Amendment privilege. (Dkt. No. 1525 at 2).  Plaintiffs' Second Notice also informed the Court that Weldzius appeared for his deposition on October 8, 2025 and "asserted his Fifth Amendment rights on a question-by-question basis."  *Id.*  In another turn of events, however, on October 27, 2025, Plaintiffs inexplicably filed a Notice of Withdrawal of their previously filed Second Notice.  (Dkt. No. 1529 at 2).[4]

On October 3, 2025, Plaintiffs filed an "Emergency Motion to Compel Fermin Rodriguez to Appear for Deposition" (Dkt. No. 1465).  On November 3, 2025, Magistrate Judge G. Alan Teague ordered Rodriguez to appear for his deposition on either November 4 or November 12, 2025; permitted the deposition to occur beyond the close of fact discovery; and ordered that Rodriguez may not make a blanket invocation of his Fifth Amendment privilege, but rather, must make a claim of privilege on a "good faith question-by-question basis."  (Dkt. No. 1539 at 7-8).

### B.    Parallel Proceedings

On May 14, 2021, the United States Environmental Protection Agency ("EPA") issued a "Clean Air Act Emergency Order" to Moving Defendants pursuant to Section 303 of the Clean Air Act, codified at 42 U.S.C. § 7603, which ordered, among other things, that the Refinery cease operations for 60 days "due to multiple improperly conducted operations that present an imminent risk to public health."  Press Release No. 21-033, EPA, *EPA Uses Emergency Powers to Protect*

---

[4] The Court is therefore unaware as to which aspect or aspects of the Notice necessitated its withdrawal.

*St. Croix Communities and Orders Limetree Bay Refinery to Pause Operations*, 2021 WL 1940781 (May 14, 2021); *see also* Clean Air Act Emergency Order, *Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC*, CAA-02-2021-1003 (EPA Region 2, 2021), accessible via https://www.epa.gov/vi/clean-air-action-section-303-limetree-bay.

On June 11, 2021, the U.S. Attorney for the Virgin Islands sent an email to counsel for Terminals and Refining stating that the U.S Attorney's Office for the District of the Virgin Islands "has received information that suggests one or more of the recent events at Limetree Bay Refinery may constitute a criminal violation of the federal Clean Air Act." (Dkt. No. 1301-5 at 2). The U.S. Attorney requested that "the owners/operators of Limetree Bay Refinery cooperate with the government by permitting a consensual visit to the refinery by 4-5 officials from EPA's criminal enforcement program." *Id.*

On July 12, 2021, the United States filed a civil Complaint against Moving Defendants, to extend the EPA's Emergency Order beyond 60 days, pursuant to Section 303 of the Clean Air Act, along with a Joint Stipulation. Complaint, *United States v. Limetree Bay Refining, LLC* ("*Limetree Civil Enforcement Action*"), No. 21-cv-0264 (D.V.I. July 12, 2021) (Dkt. No. 1); Joint Stipulation, *Limetree Civil Enforcement Action* (Dkt. No. 2). The Complaint stated that the United States was acting on the authority of the Attorney General and "at the request of the Administrator of the [EPA]." Complaint, *Limetree Civil Enforcement Action* (Dkt. No. 1 at 1). The Joint Stipulation stated that "[t]he Parties agree that further proceedings in the case should be stayed for a period of ninety days from the date of filing this Joint Stipulation," and that "Limetree Bay does not oppose the United States' Unopposed Motion for Stay filed simultaneously with this Stipulation." Joint Stipulation, *Limetree Civil Enforcement Action* (Dkt. No. 2 at 5). All deadlines in that case were

stayed repeatedly, most recently until December 1, 2022.[5]  Orders, *Limetree Civil Enforcement Action* (Dkt. Nos. 4, 7, 10, 13, 17, 21).  The Joint Stipulation certified, *inter alia*, that the Refinery had been idled; required LBT and LBR to notify the Government and the Court ninety or more days before restarting the Refinery or any Unit thereof; required submission of a "303 Order Plan" addressing a schedule for implementation of all corrective measures for findings set forth in Audit Reports submitted by LBT and LBR to the EPA; required completion of "all measures necessary to eliminate any imminent and substantial endangerment to public health or welfare or the environment" posed by the Refinery or any Unit thereof; required submission of an ambient air monitoring plan and a hydrocarbon purge plan to the EPA by LBT and LBR; and required the installation of a meteorological tower and ambient air monitors at the Refinery.  Joint Stipulation, *Limetree Civil Enforcement Action* (Dkt. No. 2 at 5).

Following the confirmation of LBR's Chapter 11 bankruptcy plan on May 23, 2022, a Subpoena for Rule 2004 Examination was issued by the Liquidating Trustee of the Limetree Bay Refining Liquidating Trust to EIG Management Company, LLC ("EIG")[6] on October 21, 2022, under the authority of the U.S. Bankruptcy Court, Southern District of Texas.  (Dkt. No. 1301 at 6).  Then, in January 2023, the United States Department of Justice ("DOJ") issued a grand jury subpoena to EIG.  *Id.*  A grand jury subpoena was also issued to LBT on March 2, 2023.  *Id.*  This was followed on April 20, 2023 by a revised grand jury subpoena issued to EIG.  *Id.*

---

[5] As Moving Defendants acknowledge, however, the Refinery facility is "shut down and may only restart operation in complete compliance with the Joint Stipulation under the watchful eye of the EPA."  (Dkt. No. 1301 at 14).

[6] As previously noted, EIG initially joined this Motion (Dkt. No. 1298 at 1) but later withdrew from the Motion (Dkt. No. 1414 at 1).

## II.    APPLICABLE LEGAL PRINCIPLES

### A.    Stay of Proceedings

The District Court's power to stay proceedings is "incidental" to its power to "control the disposition of the causes on its docket with economy of time and effort." *Bechtel Corp. v. Loc. 215, Laborers' Int'l Union of N. Am., AFL-CIO*, 544 F.2d 1207, 1215 (3d Cir. 1976) (quoting *Landis v. North American Co.*, 299 U.S. 248, 254-55 (1936)). A stay is an "extraordinary remedy," and the moving parties bear the burden of establishing their need for and "entitlement to" a stay. *Deloitte Consulting LLP v. Sagitec Sols. LLC*, 2023 WL 6037201 at *1 (D. Del. Sept. 15, 2023) (quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97-98 (2d Cir. 2012)).

A civil case may be stayed "pending resolution of a related criminal case." *Reyes v. Freeberry*, 141 F. App'x 49, 51 (3d Cir. 2005). However, such a stay is not "constitutionally required." *Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd.*, 7 F.Supp.2d 523, 526 (D.N.J. 1998) ("[T]he court is permitted to exercise its discretion to stay a case 'if the interests of justice require it.'" (citing *United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970))). This doctrine has arisen from the recognition that "parties who face both civil litigation and criminal investigation face difficult choices," such as whether to invoke the Fifth Amendment privilege. *In re 650 Fifth Ave.*, 2011 WL 3586169 at *2 (S.D.N.Y. Aug. 12, 2011) ("[T]hough a litigant in a civil action is entitled to avoid answering questions that might lead to self-incrimination, this entitlement often conflicts with the litigant's interest in testifying and obtaining whatever benefits such testimony might provide."); *see also Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97 (2d Cir. 2012) ("[T]he greatest risk posed by parallel civil and criminal proceedings is that parallel proceedings may place significant burdens upon the Fifth Amendment privilege against self-incrimination." (citation modified)).

As the Second Circuit has noted: "[a] stay can protect a civil defendant from facing the difficult choice between being prejudiced in the civil litigation, if the defendant asserts his or her Fifth Amendment privilege, or from being prejudiced in the criminal litigation if he or she waives that privilege in the civil litigation." *Louis Vuitton*, 676 F.3d at 97; *see also SEC v. Boock,* 2010 WL 2398918 at *1 (S.D.N.Y. June 15, 2010) ("A stay may be entered to address the interests of a defendant who faces the choice of being prejudiced in the civil litigation if he asserts his Fifth Amendment rights or prejudiced in the criminal litigation if those rights are waived."). Thus, in the context of parallel civil and criminal proceedings, a stay "may be warranted in certain circumstances," including where denial of the requested stay "would impair a party's Fifth Amendment privilege . . . or otherwise prejudice the criminal case." *Frantatoro v. Grabato*, 2023 WL 5605669 at *3 (D.N.J. Aug. 30, 2023) (citation modified).

Some Circuit Courts have adopted a six-factor to determine whether a stay is appropriate in light of parallel criminal proceedings: (1) the extent to which the issues in the criminal and civil cases overlap; (2) the status of the case, including whether the defendants have been indicted; (3) the plaintiff's interest in proceeding expeditiously weighed against the prejudice to plaintiff caused by a delay; (4) the private interests of and burden on defendants; (5) the interests of the court; and (6) the public interest. *See, e.g.*, *Louis Vuitton*, 676 F.3d at 99 (adopting the six-factor balancing test for the Second Circuit and noting that "several of our sister circuits have adopted similar multi-factor tests"); *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 627 (6th Cir. 2014) (adopting this six factor test with an additional factor regarding the extent to which Fifth Amendment rights are implicated); *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 78 (1st Cir. 2004) (applying a substantially similar seven-factor test that includes consideration of "good faith of the litigants"); *Keating v. Off. of Thrift Supervision*, 45 F.3d 322, 324-25 (9th

Cir. 1995) (applying a substantially similar five-factor test with additional consideration regarding the extent to which Fifth Amendment rights are implicated); *SEC v. Glob. Express Cap. Real Est. Inv. Fund, I, LLC*, 289 F. App'x 183, 191 (9th Cir. 2008) (applying *Keating* as a six-factor test); *but see Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 379-80 (4th Cir. 2013) (considering factors such as overlap of parallel proceedings, status of the cases, and the extent to which Fifth Amendment rights are implicated, without enunciating a multi-factor test).  Various district courts within the Third Circuit have adopted the six-factor test.  *See Frantatoro*, 2023 WL 5605669 at *4 (citing *Walsh*, 7 F.Supp.2d at 526-27); *Soroush v. Ali*, 2009 WL 3467897 at *1 (E.D. Pa. Oct. 28, 2009); *Rosencrans v. State Corr. Inst. at Dallas*, 2025 WL 2607820 at *2 (M.D. Pa. Sept. 9, 2025); *Dohner v. Clearfield Cnty., Pennsylvania*, 2010 WL 11694516 at *1 (W.D. Pa. Apr. 8, 2010).  The burden is on the moving party to "show that there is [a] pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order."  *E.M.A. Nationwide, Inc.*, 767 F.3d at 627-28 (citation modified).

However, this six-factor test is "not [a] mechanical device[] for churning out correct results in overlapping civil and federal proceedings" and should not "replac[e] the district court's studied judgment as to whether the civil action should be stayed based on the particular facts before it and the extent to which such a stay would work a hardship, inequity, or injustice to a party, the public or the court."  *Louis Vuitton*, 676 F.3d at 99. Thus, the multi-factor test should serve as only "a rough guide for the district court" in the exercise of its discretion.  *Id.*

### B.    The Fifth Amendment Privilege

The Fifth Amendment privilege against self-incrimination "may be raised in civil as well as in criminal proceedings and applies not only at trial, but during the discovery process as well." *S.E.C. v. Graystone Nash, Inc.*, 25 F.3d 187, 190 (3d Cir. 1994).  However, invocation of the Fifth

Amendment privilege in a civil case may "carry some disadvantages," in that it "may give rise to an adverse inference against the party claiming its benefits." *Id.* at 190-91 ("In a civil trial, a party's invocation of the privilege may be proper, but it does not take place in a vacuum; the rights of the other litigant are entitled to consideration as well."); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]"); *Mirlis v. Greer*, 952 F.3d 36, 47 (2d Cir. 2020) (same); *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911 (9th Cir. 2008) ("When a party asserts the privilege against self-incrimination in a civil case, the district court has discretion to draw an adverse inference from such assertion."); *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1304 (11th Cir. 2009) ("[I]n a civil suit such as this one, the court may draw adverse inferences against a party that invokes the Fifth Amendment."). Thus, the Third Circuit has noted that "[t]he principle that the invocation of the privilege may not be too 'costly' does not mean that it must be 'costless.'" *Graystone Nash*, 25 F.3d at 191; *see also Eagle Hosp. Physicians, LLC*, 561 F.3d at 1304 ("The decision to invoke the Fifth Amendment does not have to be consequence-free.").

## III.  DISCUSSION

Moving Defendants argue that because Weldzius and Rodriguez[7] will invoke their Fifth Amendment privilege, the Moving Defendants are unable to "obtain evidence necessary for a substantive defense." (Dkt. No. 1301 at 8). Given that impediment, Moving Defendants argue that "no doubt exists that justice requires a stay of this matter." *Id.* Using the six-factor test as a

---

[7] As noted above, since the filing of the instant Motion, Rinker moved to dismiss his motion for a protective order filed in the Southern District of Texas and was reported to have testified substantively at his deposition without invoking his Fifth Amendment privilege. (Dkt. No. 1525 at 2). However, Plaintiffs' withdrawal of their Notice, which contained information regarding the Rinker deposition, raises some uncertainty as to what transpired at that deposition.

"rough guide" together with the Court's own "studied judgment" of the surrounding facts and circumstances, the Court concludes that a stay of proceedings is not warranted.  *See Louis Vuitton*, 676 F.3d at 99.

  **A.**  **Extent of Overlap between Criminal and Civil Cases**

  Moving Defendants argue that "no dispute exists of a perfect symmetry between the present civil proceedings and any potential criminal proceedings" because the Clean Air Act (the "CAA") provides for both civil and criminal penalties for violations and the "same operative facts" that underlie Plaintiffs' present claims would "potentially support" any alleged criminal violations under the CAA.  (Dkt. No. 1301 at 11).  In response, Plaintiffs assert that absent a criminal indictment "defining the parameters of the criminal case," it is difficult for a Court to assess this "most important threshold issue" of the extent of overlap.  (Dkt. No. 1322 at 10).

  Courts typically grant a stay "when both the civil and criminal actions stem from the same or interrelated events" and are "likely to include the same, or at least overlapping, witnesses and documents."  *Frantatoro*, 2023 WL 5605669 at *4.  Courts also assess overlap between a civil and a criminal case by determining whether the parties to the two actions are identical.  *See Deloitte Consulting*, 2023 WL 6037201 at *2; *see also United States v. Priv. Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 811 F.Supp. 802, 806 (E.D.N.Y. 1992) ("[A] stay is most appropriate where the subject matter of the parallel civil and criminal proceeding or investigation is the same and where the government is prosecuting both proceedings.").

  As a threshold matter, however, "courts generally do not stay proceedings in the absence of an indictment."  *E.M.A. Nationwide, Inc.*, 767 F.3d at 628 ("Even if [the civil and criminal proceedings] were to overlap, because there is not yet a criminal case, it cannot be said that this factor weighs in Defendants' favor."); *see also Priv. Sanitation Indus. Ass'n*, 811 F.Supp. at 805

("Pre-indictment requests for a stay of civil proceedings are generally denied.").  That is in part because, "where a civil defendant has not been indicted, it is difficult for a court to assess precisely the extent to which the criminal and civil matters overlap."  *Deloitte Consulting*, 2023 WL 6037201 at *2 (citation modified); *see also Soroush*, 2009 WL 3467897 at *2 ("In the present case, neither defendant has been indicted so there are no readily-definable criminal proceedings" and therefore finding the first factor to weigh against granting a stay); *U.S. ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 571 F.Supp.2d 758, 762 (W.D. Tex. 2008) ("Where 'no indictment has as yet been handed up against the defendant, the court cannot determine with certainty the degree of overlap between the civil action and the criminal investigation.'" (citation modified)); *U.S. ex rel. Shank v. Lewis Enters., Inc.*, 2006 WL 1064072 at *4 (S.D. Ill. Apr. 21, 2006) (finding, pre-indictment, that the question of whether civil and criminal proceedings "*will* overlap" to be "a matter of speculation" that "counsels against a stay" (emphasis in original)).  The absence of a criminal indictment in the context here creates the same problem with assessing the degree of overlap between the instant case and any hypothetical criminal case, as discussed above.

As noted earlier, Moving Defendants attempt to address this problem by asserting that there is "perfect symmetry between the present civil proceedings and any potential criminal proceedings."  (Dkt. No. 1301 at 11).  The Court acknowledges that to the extent that the four Release Events[8] at the Refinery—which Plaintiffs allege caused the property, environmental, and health damage for which they seek relief—are being criminally investigated, the civil and criminal actions would "stem from the same or interrelated events" and may "include the same, or at least overlapping, witnesses and documents."  *Frantatoro*, 2023 WL 5605669 at *4.  Nonetheless,

---

[8] *See Boynes*, 2023 WL 3166603 at *1-2 (detailing the history and background of the four Release Events).

absent a criminal indictment against which to "compar[e]" the allegations in the instant civil litigation, "it is difficult for a court to assess precisely the extent to which the criminal and civil matters overlap." *Gran Sabana Corp. N.V. v. Kossoff*, 2021 WL 3666116 at \*3 (S.D.N.Y. Aug. 17, 2021).

In short, while there *may* be overlap between the instant litigation and any criminal proceedings that arise under the CAA—if any such proceedings ever come to fruition—the Court is unable to draw a conclusion as to the potential overlap—much less draw a conclusion of "perfect symmetry" as urged by Moving Defendants—given the significant difference in the legal frameworks of the proceedings,[9] the uncertainty as to what, if any, charges may be brought, and the absence of the Government from the instant matter.[10]  Accordingly, Moving Defendants have not carried their burden to demonstrate that the first factor, as to the "the extent to which the issues in the criminal and civil cases overlap," *Frantatoro*, 2023 WL 5605669 at \*4, weighs in their favor.

## B.    Status of the Criminal Case

Moving Defendants argue that a stay is appropriate even though "no indictment arising out of the emission events at the Refinery" has been issued, because "a criminal investigation is pending."  (Dkt. No. 1301 at 13).  Plaintiffs argue, to the contrary, that the Moving Defendants' "stale evidence does nothing to show an active investigation by the government."  (Dkt. No. 1322 at 13).

---

[9] The contrast is between a putative class action sounding in local tort law and a federal Clean Air Act proceeding.

[10] *See, e.g.*, *Priv. Sanitation Indus. Ass'n*, 811 F.Supp. at 806 ("[A] stay is most appropriate where the subject matter of the parallel civil and criminal proceeding or investigation is the same and where the government is prosecuting both proceedings."); *Jostens, Inc. v. Hammons*, 2021 WL 734978 at \*2 (E.D. Tex. Feb. 25, 2021) ("Even assuming an active criminal case existed, the overlap would be minimal because Plaintiff is a private party—not the Government.").

As previously noted, courts have held that a stay of a civil case is "most appropriate" where "a party to the civil case has already been indicted for the same conduct." *E.M.A. Nationwide, Inc.*, 767 F.3d at 628; *see supra,* cases cited in Section III(A).  By the same token, *pre*-indictment requests for a stay are generally denied. *State Farm Mut. Auto. Ins. Co. v. Beckham-Easley*, 2002 WL 31111766 at *3 (E.D. Pa. Sept. 18, 2002) ("Where civil defendants are not subject to criminal charges, [] the 'inappropriateness of a stay is manifest.'"); *E.M.A. Nationwide, Inc.*, 767 F.3d at 628 ("[C]ourts generally do not stay proceedings in the absence of an indictment."); *Sumpter v. Albany Cnty.*, 2020 WL 4816191 at *3 (N.D.N.Y. Aug. 19, 2020) ("[A] post-indictment procedural posture appears in practice to be almost a prerequisite to granting a stay of related civil proceedings.").

Here, the lack of an indictment in a hypothetical parallel criminal case is alone sufficient reason to deny a stay. *See Chao v. Fleming*, 498 F.Supp.2d 1034, 1038 (W.D. Mich. 2007) ("[T]he fact that a defendant has not been indicted generally weighs against a stay and may, by itself, provide a sufficient basis for denying a stay[.]")[11]; *Barker v. Kane*, 149 F.Supp.3d 521, 527 (M.D. Pa. 2016) ("When a party seeking a stay has not yet been indicted, the court may deny the motion 'on that ground alone.'")[12]; *State Farm*, 2002 WL 31111766 at *2 (same); *Priv. Sanitation Indus.*

---

[11] Although the Court in *Chao* ultimately granted a stay, it found that an indictment in the parallel criminal case was "an eventuality," based upon notification to the Court—both orally and in writing—from the Assistant United States Attorney ("AUSA") in the parallel criminal case affirming that "the Government was conducting an investigation of Defendants' alleged retirement benefits fraud and bank fraud."  498 F.Supp.2d at 1036-38.  In addition, the AUSA represented that "[t]he United States believes that it has sufficient evidence to bring criminal charges against [Defendants] for multiple acts of embezzlement/conversion of retirement benefits, contrary to 18 U.S.C. § 1344."  *Id.* at 1036-37.

[12] In *Kane*, the stay was ultimately granted because "the supervising judge of the grand jury referred the matter of Barker's termination to the Montgomery County District Attorney for investigation" and "[f]ollowing an independent investigation of the foregoing events, the [] County District Attorney filed two criminal complaints against Kane."  149 F.Supp.3d at 525-26.

*Ass'n*, 811 F.Supp. at 806 ("[S]ince Avellino has yet to be indicted by any grand jury, his motion to stay may be denied on that ground alone."); *Gran Sabana Corp. N.V.*, 2021 WL 3666116 at *2 ("'[W]hether the defendant has been indicted has been described as the most important factor to be considered in the balance of factors,' and indeed courts frequently deny stay motions on this ground alone[.]" (citation modified)).

However, it is "still possible" to obtain a stay, even in the absence of an indictment, if it can be shown that the Government is "conducting an *active* parallel criminal investigation." *Walsh*, 7 F.Supp.2d at 527 (emphasis added). In the pre-indictment stage, the "key question" for courts to consider "is whether the criminal proceedings have substantially progressed beyond the investigatory stage to the filing of formal charges against a particular defendant, so that there is an imminent likelihood that the defendant will be subject to a criminal proceeding, including a trial, in the very near future." *Maldonado v. City of New York*, 2018 WL 2561026 at *2 (S.D.N.Y. June 4, 2018) (citation modified). This can be evidenced by whether search warrants have been executed, whether subpoenas have been issued to defendants, whether defendants have been informed that they are targets of a criminal investigation, and whether the Government has affirmed to the Court the active nature of the investigation. *Walsh*, 7 F.Supp.2d at 527.

In addition to the lack of an indictment, there is little or no evidence of the existence of an *active* criminal investigation in the instant matter. Moving Defendants do not allege that search warrants have been issued or executed; or that any target letters have been issued to either individuals or corporate entities. The Government is also not providing affirmative statements that the investigation is active, an indictment is imminent, or that any developments are expected in any criminal case. *See, e.g.*, *Chao*, 498 F.Supp.2d at 1038; *Barker*, 149 F.Supp.3d at 527.

The absence of these indicia of an active criminal investigation is not overcome by the subpoenas that were issued. First, one of the three subpoenas that Moving Defendants identify as evidence of an ongoing criminal investigation is not probative on the issue. Moving Defendants identify a Subpoena for Rule 2004 Examination issued by the Liquidating Trustee of the Limetree Bay Refining Liquidating Trust to EIG in October 2022 under the authority of the U.S. Bankruptcy Court, Southern District of Texas ("Subpoena for Rule 2004 Examination") (Dkt. No. 1301 at 6). A subpoena from a Trustee in a bankruptcy proceeding is not itself evidence of an active criminal investigation. It is unclear to the Court—and Moving Defendants provide no explanation—why a Subpoena for Rule 2004 Examination issued by the Liquidating Trustee of the Limetree Bay Refining Liquidating Trust under the authority of the U.S. Bankruptcy Court, Southern District of Texas is probative as to the existence of a criminal investigation.

Second, the three subpoenas to which Moving Defendants refer were issued over two years ago. This is not indicative of an active criminal investigation, especially where—as here—Moving Defendants have projected that the statute of limitations in the criminal case will expire on May 30, 2026. *Id.* at 1. Given the imminence of this deadline, one would expect that an active investigation would have resulted in greater activity associated with the criminal matter. However, even now, Moving Defendants must resort to a limited amount of activity that is over two years old.

Third, the grand jury subpoena issued to EIG in January 2023, and reissued in April 2023—which Moving Defendants describe as allegedly "request[ing] many of the same documents [as] the Rule 2004 Subpoena" (Dkt. No. 1301 at 6)—contains only two broad document requests related to communications between EIG and Limetree entities, and travel to and from St. Croix by EIG employees and contractors. (Dkt. No. 1524 at 7). Another grand jury subpoena was issued to LBT in March 2023, the contents of which Moving Defendants have not described to the Court,

nor was the subpoena filed as an Exhibit. (Dkt. No. 1301 at 6); *see also State Farm*, 2002 WL 31111766 at *1-2 (target letters received by two defendants where "[n]either the scope nor the particular issues surrounding the investigation are known" are insufficient to support a stay). Thus, none of the facts set forth by Moving Defendants suggest an active or ongoing criminal investigation as to the Release Events at the Refinery, or are sufficient to justify a stay of these civil proceedings.

Finally, there has been no word from the Government in this litigation affirming that an active parallel criminal investigation is ongoing. *See Walsh*, 7 F.Supp.2d at 526 (granting a stay in part because the Government submitted "a sealed, *in camera* affidavit elaborating on the status of the criminal investigation"); *Chao*, 498 F.Supp.2d at 1039 (granting a stay because statements made by an Assistant U.S. Attorney made it apparent that an indictment is "but 'an eventuality'" and that the Government "may be investigating" additional charges); *United States v. All Articles of Other-Sonic Gneric Ultrasound Transmission Gel*, 2013 WL 1285413 at *3 (D.N.J. Mar. 27, 2013) (granting a stay in part because "[h]ere, no indictment has issued, but the government has indicated that it is actively conducting a parallel criminal investigation."). While not a requirement, affirmation from the Government as to the status of the criminal investigation appears to often be present when the rare pre-indictment stay is granted. *See, e.g.*, *Walsh*, 7 F.Supp.2d at 526; *Chao*, 498 F.Supp.2d at 1039.

In view of the foregoing, Moving Defendants have not borne their burden to demonstrate that the second factor—"the status of the case," *Frantatoro*, 2023 WL 5605669 at *4—weighs in their favor. This second factor does not, therefore, aid their cause.

C.      Plaintiffs' Interests

Courts must consider "the plaintiff's interest in proceeding expeditiously weighed against the prejudice to plaintiff caused by a delay." *Frantatoro*, 2023 WL 5605669 at *4. Moving Defendants argue that no harm will come to Plaintiffs as the Refinery facility is "shut down and may only restart operation in complete compliance with the Joint Stipulation under the watchful eye of the EPA." (Dkt. No. 1301 at 14). They thus argue that the "only potential 'prejudice'" to Plaintiffs is an approximate ten-month delay in a civil case, and "the mere fact of a less expeditious resolution is insufficient to show prejudice." *Id.* (quoting *Barker*, 149 F.Supp.2d at 528). Plaintiffs argue, on the other hand, that they have a "substantial interest in the efficient conduct of complex litigation" and that a delay in "civil actions for underlying criminal activity" would be "perverse if plaintiffs who claim to be the victims of criminal activity were to receive slower justice than other plaintiffs because the behavior they allege is sufficiently egregious to have attracted the attention of the criminal authorities." (Dkt. No. 1322 at 14 (citing *State Farm*, 2002 WL 31111766 at *3)). Plaintiffs further point to the "delays plaguing this case" as this litigation "enter[s] its fifth year," and characterize Moving Defendants' request for a stay as part of "never-ending delay tactics requiring wasted judicial resources and time." *Id.* at 15.

It is true that "[d]elays in civil cases are fairly common," and thus a mere delay is not a "particularly unique injury" for Plaintiffs. *Walsh*, 7 F.Supp.2d at 528; *In re Herley Industries Inc. Securities Litig.*, 2007 WL 1120246 at *2 (E.D. Pa. Apr. 11, 2007) ("[C]ourts may insist the plaintiff establish more than simply a delay in his right to expeditiously pursue his claim . . . . the plaintiff should demonstrate a unique injury, such as the dissipation of assets or an attempt to gain an unfair advantage from the stay."). However, this Court has already recognized the impact of

delays on this litigation in a Memorandum Opinion and Order issued over one and a half years ago

denying a stay of discovery by a group of Defendants:

> While this matter has already been pending for nearly three years, it remains in the earliest stages of litigation due to the imposition of two prior stays that were necessitated by the circumstances of the case. Further delays in the litigation of this matter pose a risk of losing evidence, which would be prejudicial to Plaintiffs. The extent of the prejudice here is magnified by the significant delays in the action that have already occurred and the nature of the discovery at issue, for which Plaintiffs have argued that the parties would likely need to conduct over one hundred fact depositions.

*Boynes v. Limetree Bay Ventures, LLC*, 2024 WL 5681675 at *2 (D.V.I. May 16, 2024) (Dkt. No.

663). The two prior stays in this case related to the pendency of bankruptcy proceedings (Dkt. No.

82) and extensive preliminary injunction proceedings (Dkt. No. 136)—the latter of which

ultimately resulted in the Court's Order Implementing Water Distribution Program. The fact that

this litigation still remains in the discovery stage after five years means that any further delay does,

in fact, represent a unique and particular injury to Plaintiffs and weighs against the stay requested

here.

Additionally, the nature of the underlying facts of this litigation—alleging "ongoing

environmental damage"—and the relief sought present unique injuries to Plaintiffs that would

counsel against further delays in the litigation. *United States v. Electron Hydro, LLC*, 2022 WL

594909 at *2-3 (W.D. Wash. Feb. 28, 2022) (denying a stay of civil proceeding due to parallel

criminal proceedings, even when "a preliminary trial date has been set" in the criminal case, due

to the plaintiff's interest in "minimiz[ing] or mitigat[ing] the[] ongoing harms" of the "toxins from

the artificial turf remaining in the river [that] are causing ongoing environmental damage"). For

example, the Third Circuit has previously described the impact on local cisterns due to the Release

Events from the Refinery as follows:

> In early 2021, the refinery reopened. Only three days later, it released "a mist with heavy oil in it" that settled on nearby properties. A few months later, it again

> spewed a heavy-oil mist and spat out flames dozens of feet high.  The EPA ordered Terminals and Refining to stop running the refinery, so they did.
>
> Yet the damage was done.  Some of the oil had gotten into cisterns, which, in the Virgin Islands, "are a way of life[]" . . . . Strainers in the pipes filter out large debris but cannot keep out oil. Because the islands have no reliable public water supply, many residents rely on these tanks for cooking, bathing, and drinking water.
>
> So the companies tried to fix their mess.  First, they sent teams to identify and clean contaminated cisterns.  Then they hired a company to inspect residents' properties and told it to pay residents if it found even a speck of oil.
>
> Still, not all residents had access to clean water.

*Boynes*, 110 F.4th at 608.

Further, the Plaintiffs' Consolidated Second Amended Class Action Complaint ("CSAC"), filed on August 4, 2025, alleges that the release events "impacted Plaintiffs and Class Members, including their health, real property and personal property"; "affected property values"; "contaminated and harmed the local water supply"; "is a blight and nuisance on Plaintiffs' and the Class Members' communities"; deprived Plaintiffs and Class Members of "their free use and enjoyment of their real and personal property, including the ability to safely use their cisterns for potable water"; and caused "damage to foliation and crops."  (Dkt. No. 1327 at 5-6).  The CSAC alleges that these toxins "continue to be sources of hazardous substance emissions into, onto, within, and surrounding real property and personal property" and have not been remediated.  *Id.* at 6.  Thus, while Moving Defendant claim that "no further potential for harm to Plaintiffs from the Refinery exists" (Dkt. No. 1301 at 14), delay in the resolution of this litigation presents a particular and unique injury because it allegedly implicates the physical health, welfare, and safety of a significant portion of the population of the island of St. Croix.  *See Electron Hydro, LLC*, 2022 WL 594909 at *2-3; *cf. Barry Farm Resident Council, Inc. v. U.S. Dep't of Navy*, 1997 WL 118412 at *2 (D.D.C. Feb. 18, 1997) ("In filing this lawsuit, plaintiffs have attempted to compel the Navy and GSA to act upon their studies and actually to clean up the [oil-]contaminated [soil and ground

water] sites. The Court refuses to be a participant in further delay by granting defendants' motion to stay the proceedings."); *Nez Perce Tribe v. Midas Gold Corp.*, 2020 WL 113348 at *3 (D. Idaho Jan. 8, 2020) (denying a stay due to a parallel administrative proceeding in part because "the Tribe has presented evidence that there will be real, tangible harm if the discharge of pollutants [into the Salmon River and its tributaries] continues."). In sum, Plaintiffs have a particular and unique interest in expeditious resolution of this litigation, and a delay in such resolution would result in a specific prejudice.

The length of time that this litigation case has progressed to date and the current stage of the litigation also weighs against granting a stay. *See Louis Vuitton*, 676 F.3d at 104 (noting that, *inter alia*, "[i]n light of the length of time that the lawsuit had progressed by the time the indictments issued . . . granting a stay posed a particular risk to [Plaintiff's] interest in the prompt resolution of its claims."). First, it has been almost five years since this litigation was initiated, and Moving Defendants became aware, *inter alia*, of the underlying facts that they claim expose them to potential criminal proceedings under the CAA. It has also been over two years since Moving Defendants were issued grand jury subpoenas. *See Infotek Corp. v. Preston*, 2021 WL 4521330 at *3 (D. Md. Oct. 4, 2021) (finding that it weighed against the moving party that the moving party was aware of "the existence of a related criminal investigation" for almost four years and an indictment for seven months prior to filing for a stay of civil proceedings). This unexplained delay in seeking a stay renders the request for the stay questionable.

Moreover, this litigation is at a critical stage. Two motions for preliminary settlement approval—settling the claims against seven Defendants in this litigation—are currently pending

22

before this Court.[13] (Dkt. Nos. 1098; 1198). Fact discovery closed on October 17, 2025 (Dkt. No. 1160 at 4),[14] and the close of expert discovery was recently extended from February 10, 2026 to March 6, 2026 (Dkt. No. 1540 at 2). Thus, Plaintiffs have a heightened interest in proceeding expeditiously with this litigation, and the settling parties would be uniquely prejudiced by a stay of the Court's consideration of the proposed preliminary settlements.

Accordingly, Moving Defendants have not carried their burden to demonstrate that the third factor—"the plaintiff's interest in proceeding expeditiously weighed against the prejudice to plaintiff caused by a delay," *Frantatoro*, 2023 WL 5605669 at *4—weighs in their favor. Thus, this factor does not warrant the "extraordinary remedy"[15] of a stay of proceedings.

### D. Moving Defendants' Interests

Moving Defendants argue that they are prejudiced in two ways by their former personnels' invocation of the Fifth Amendment and refusal to answer questions. (Dkt. No. 1301 at 16). First, Moving Defendants argue that they have "no ability to present any valid defenses." *Id.* Second, they argue that "adverse inferences allowed as a result of former personnel asserting their Fifth Amendment rights may be imputed to [Moving Defendants]." *Id.* Plaintiffs argue, to the contrary,

---

[13] Plaintiffs filed two separate Motions for Preliminary Settlement Approval on April 3, 2025 and April 29, 2025. (Dkt. Nos. 1098; 1198). A Preliminary Settlement Hearing was held on December 10, 2025 regarding both motions, and the Court's ruling is pending.

[14] Terminal and Refining have since filed a "Motion to Amend Scheduling Order and Reopen Fact Discovery" (Dkt. No. 1616). BPPNA, Terminals, and Refining have also filed a "Joint Motion for a Status Conference and Temporary Administrative Stay Pending the Requested Conference" (Dkt. No. 1639) which includes, *inter alia*, a request to reopen discovery and for a revised case schedule.

[15] Moving Defendants go to great lengths in their Reply to distinguish a "not favored" remedy from a "disfavored" remedy. (Dkt. No. 1330 at 7). The Court does not find this argument worthy of a response. Moving Defendants further argue that only "some courts" have held a stay to be an "extraordinary remedy," and instead cite Supreme Court precedent which characterizes a stay as "rare circumstances." *Id.* at 8 (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)). Again, the Court does not find this argument worthy of a response.

that Moving Defendants "fail to articulate any basis for how their defenses may be impacted by two individuals feigning Fifth Amendment concerns[.]" (Dkt. No. 1322 at 16). Plaintiffs further argue that, prior to the Moving Defendants' filing of their Motion, "several 'high-level personnel' employed by the Limetree entities already had been deposed, and none expressed any Fifth Amendment concerns." *Id.*

First, the interests that Moving Defendants assert will be prejudiced absent a stay—their "ability to present any valid defenses" and protection from "adverse inferences" that may be imputed to them (Dkt. No. 1301 at 16)—are not interests that a civil stay was designed to protect. A civil stay due to parallel proceedings is designed to protect individuals who are parties to civil litigation "from facing the difficult choice between being prejudiced in the civil litigation, if the defendant asserts his or her Fifth Amendment privilege, or from being prejudiced in the criminal litigation if he or she waives that privilege in the civil litigation." *Louis Vuitton*, 676 F.3d at 97; *see also Walsh*, 7 F.Supp.2d at 528 ("The Court has already alluded to the burden on the defendants. The individual defendants in this action who are targets of the grand jury investigation must choose between waiving their Fifth Amendment rights and defending themselves in the civil lawsuit or asserting the privilege and probably losing the civil case."). Corporations, such as LBT and LBR, do not possess a constitutional privilege against self-incrimination. *See Braswell v. United States*, 487 U.S. 99, 105 (1988) ("[A] corporation has no Fifth Amendment privilege[.]"); *Louis Vuitton*, 676 F.3d at n.5 ("Corporations do not have a Fifth Amendment right against self-incrimination."); *United States v. Lawn Builders of New England, Inc.*, 856 F.2d 388, 393 (1st Cir. 1988) ("It is well-settled that a corporation has no Fifth Amendment privilege[.]" (citing *United States v. White*, 322 U.S. 694, 699 (1944))); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F.Supp. 805, 809 (N.D. Cal. 1989) ("Fifth Amendment self-incrimination protections will not be

adversely affected by denial of the stay, since Triple A, a corporate defendant, is not entitled to those protections.") (CAA case); *United States v. Rudy's Performance Parts, Inc.*, 647 F.Supp.3d 408, 416 (M.D.N.C. 2022) ("The corporate Defendant enjoys no Fifth Amendment right.") (CAA case); *Volmar Distributors, Inc. v. New York Post Co., Inc.*, 152 F.R.D. 36, 40 (S.D.N.Y. 1993) ("However, unlike [Mr.] Orlando and [Mr.] La Chance, these defendants do not have a Fifth Amendment privilege; American and Pelham are corporations[.]").  Thus, Moving Defendants have no Fifth Amendment privilege at stake which belong to them as civil litigants in this litigation. The Court is not aware of any case law—and Moving Defendants present none—wherein the rationale for a stay based upon an invocation of the Fifth Amendment privilege has been stretched to protect a corporate defendant under circumstances such as these.  Indeed, the current situation, as presented by Moving Defendants, is far afield from the paradigmatic situation of an individual facing both civil and criminal litigation being forced to choose between a constitutional right against self-incrimination in an active criminal prosecution and mounting a civil defense.

Second, the individuals who have sought to invoke their Fifth Amendment privilege are not parties in this civil litigation; thus, they have no need to choose between waiving their Fifth Amendment privilege and defending themselves in this lawsuit.  Courts generally deny requests for a stay based on a civil defendant's employee's invocation of the Fifth Amendment for this reason.  *See, e.g.*, *In re 650 Fifth Ave.*, 2011 WL 3586169 at *7 ("Claimants do not explain why the fact that their employees may not testify because of the privilege makes their situation any more dire or unfair than that of any other party who cannot find witnesses to testify on his behalf."); *Deloitte Consulting*, 2023 WL 6037201 at *5 ("That interest [in not undermining a criminal defendant's privilege against compelled self-incrimination] is not at issue, however, in a case such as this one, in which the criminal defendants are not parties to the civil cases. Because they face

no liability in the civil case, the criminal defendants are free to exercise their Fifth Amendment rights as they choose in the civil case without any potential penalty attached to that exercise. Nor is there any other way in which proceeding with the civil case is likely to compromise the defendants' rights in the criminal proceeding.").    Particularly when the parallel criminal proceeding remains in the pre-indictment stage, courts have been leery of a corporate defendant's request for a stay based on an employee's Fifth Amendment rights, because it is both premature, and it does not implicate a civil defendant's privilege against self-incrimination—given that the corporation has no such privilege and the employee is not a party to the litigation who must mount a civil defense:

> [I]n this case, no individual, never mind a party to these actions, has been indicted in the parallel criminal investigation on substantive charges relating to issues involved in this action.  Thus no [civil] defendant in this action faces an acute Fifth Amendment dilemma necessitating a stay.
>
> ***
>
> [I]t may be that a stay is warranted 'when a *claimant* validly invokes the Fifth Amendment and expeditiously seeks the court's help in protecting his interests,' but it is not clear that the same result follows where the claimant cannot invoke the Fifth Amendment [due to the fact that it is a corporation].  Similarly, though a stay may be warranted as to a corporation 'where a[nother] party to the civil case has already been indicted for the same conduct,' it is not clear that the same result follows where nobody—never mind a party—has been indicted and 'there is nothing to suggest that indictments are imminent.'

*In re 650 Fifth Ave.*, 2011 WL 3586169 at *8-9.  The *In re 650 Fifth Ave.* court thus concluded that because a stay is unlikely to be warranted where either a party to the litigation does "not face a Fifth Amendment dilemma" or "where the criminal proceeding has not 'ripened' to the point that the criminal proceeding has reached the beginning of the end" for any party, "the Court is hard pressed to conclude that a stay is warranted where neither is true." *Id.* at *9.  The same conclusion follows under the present circumstances.

This wariness to grant a stay on the basis of a corporate defendant's employee's invocation of their Fifth Amendment privilege is also, in part, because a corporation "can have any of its [employees who are not constrained by the invocation of the Fifth Amendment privilege] serve as its witnesses." *Deloitte Consulting*, 2023 WL 6037201 at *4. Indeed, in another civil CAA case filed against a corporate defendant where "a criminal investigation [was] ongoing" and "no indictment ha[d] issued," the Court denied a stay based on the civil defendant's employee's invocation of his Fifth Amendment rights. *See Rudy's Performance Parts, Inc.*, 647 F.Supp.3d at 416. Despite the employee being the corporation's "sole officer," the corporate defendant "employ[ed] approximately 20 individuals" which "suggest[ed] that it could appoint some other knowledgeable employee(s) to respond to discovery requests on the corporate Defendants' behalf."[16] *Id.* at 417. Thus, the Court does not credit Moving Defendants' claim that they have "no ability to present any valid defenses" (Dkt. No. 1301 at 16), especially in light of the other depositions that have proceeded in this case and the marginal number of depositions out of the total number of depositions in which this issue has arisen.

Finally, Moving Defendants' argument that "adverse inferences allowed as a result of former personnel asserting their Fifth Amendment rights may be imputed to [Moving Defendants]" is insufficient to justify the granting of stay. *Id.* at 16. The Supreme Court has ruled that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify." *Baxter*, 425 U.S. at 318. As such, Moving Defendants are correct in their observation

---

[16] Indeed, at least one court has found this factor to weigh in favor of granting a stay only when the corporate employee invoking their personal Fifth Amendment right—following the employee's indictment in an overlapping criminal case—is "the only individual who can speak on [the civil defendant corporation's] behalf[.]" *Med. Inv. Co. v. Int'l Portfolio, Inc.*, 2014 WL 2452193 at *3 (E.D. Pa. May 30, 2014). Thus, although "a corporation[] has no Fifth Amendment right," a corporate defendant "may be the unintended beneficiary of a corporate employee's personal invocation of the Fifth Amendment privilege[.]" *Id.*

that it is possible that an adverse inference drawn from a non-party's invocation of the Fifth Amendment *may* also be drawn against a party associated with the individual invoking the privilege. *See, e.g., LiButti v. United States*, 107 F.3d 110, 121-25 (2d Cir.1997) (establishing a non-exclusive four factor test to analyze whether such imputation is appropriate); *Williams v. Kohl's Dep't Stores, Inc.*, 2020 WL 3882953 at *21-22 (C.D. Cal. June 16, 2020) (applying the *LiButti* factors to a "former employer-employee relationship" and finding an imputation of a former employee's adverse inference to the employer appropriate under the facts presented). Indeed, the Third Circuit has acknowledged that "[t]he principle that the invocation of the privilege may not be too 'costly' does not mean that it must be 'costless,'" and on such "disadvantage" to the invocation is the possibility of an adverse inference to be drawn from the silence. *Graystone Nash*, 25 F.3d at 191 ("In a civil trial, a party's invocation of the privilege may be proper, but it does not take place in a vacuum; the rights of the other litigant are entitled to consideration as well."). Whether an adverse inference from a non-party deponent's invocation of the Fifth Amendment may be drawn against any Defendant is a separate legal issue that would require briefing based upon the specific facts once such an issue has ripened. However, at this point in time, the *possibility* of an "adverse inference" which *may properly* be imputed to a Defendant is not grounds to justify a stay of the civil litigation. *InfoTeK Corp. v. Preston*, 760 F.Supp.3d 347, 359 (D. Md. 2024) ("Indeed, if a party against whom an adverse inference could be drawn based on a Fifth Amendment privilege invocation could automatically avoid application of any such inference by simply suspending a civil case until all risk of future danger of adverse consequences in a criminal case ended, civil cases parallel to criminal cases would almost by definition have to be stayed, and adverse inferences would never be drawn.").

Accordingly, Moving Defendants have not carried their burden to demonstrate that the fourth factor—the "private interests of and burden on defendants," *Frantatoro*, 2023 WL 5605669 at *4—weighs in their favor.

### E.    Court's Interests

Moving Defendants argue that the interests of the Court weigh in favor of a stay because "the Court would be burdened by numerous challenges of privilege during the discovery process" due to the "substantial overlap between the parallel criminal and civil proceedings."  (Dkt. No. 1301 at 19).  Plaintiffs assert that while "[i]n some instances, staying discovery until the resolution of parallel criminal proceedings may minimize the Court's burden by avoiding duplicative judicial efforts," here, "[g]iven that no criminal charges have been brought against the civil defendants, there are no duplicative judicial efforts to avoid."  (Dkt. No. 1322 at 18).

The Court's interest lies in its "judicial efficiency in terms of managing its caseload." *Walsh*, 7 F.Supp.2d at 528.  Courts have held that it is generally contrary to a court's efficiency interests to stay an active civil litigation when no parallel criminal action is pending.  *See, e.g.*, *Soroush*, 2009 WL 3467897 at *3 ("The Court has an interest in the efficient management of its docket. To stay a case in anticipation of a parallel criminal proceeding that may or may not be initiated jeopardizes this interest."); *Priv. Sanitation Indus. Ass'n*, 811 F.Supp. at 808 ("Courts must be mindful that a policy of issuing stays solely because a litigant is defending simultaneous [civil and criminal] lawsuits would threaten to become a constant source of delay and an interference with judicial administration." (citation modified)).

Additionally, absent an active criminal case, there is no risk of inconsistent or duplicative rulings.  *Frantatoro*, 2023 WL 5605669 at *6 ("[T]here is a risk of inconsistent rulings if this Court is called upon to resolve issues common to both the Criminal Case and this action.").  Further,

given that this particular privilege issue has arisen only with regard to three proposed depositions among the eighty-five depositions permitted in this litigation, the Court finds that there is not a significant risk that this Court "will be faced with repeated discovery disputes regarding whether Defendants have properly invoked their privilege." *Id*. Thus, notwithstanding that Moving Defendants propose only "an approximate 10-month delay" (Dkt. No. 1301 at 14), any delay does not serve the Court's interest in its "judicial efficiency in terms of managing its caseload." *Walsh*, 7 F.Supp.2d at 528.

Accordingly, Moving Defendants have not carried their burden to demonstrate that the fifth factor—"the interests of the court," *Frantatoro*, 2023 WL 5605669 at *4—weigh in their favor.

### F.    Public's Interests

Moving Defendants argue that "[g]enerally, the grant of a stay of a civil case does not harm the public interest," and that the "relatively short delay is more than warranted[.]" (Dkt. No. 1301) at 20). In turn, Plaintiffs argue that "the public [] has a significant interest in ensuring the flow of this Court's judicial docket so that justice may be administered to the instant litigants, as well as all other litigants before this Court, in a timely fashion." (Dkt. No. 1322 at 19 (citing *In re Plastics Additives Antitrust Litig.*, 2004 WL 2743591 at *7 (E.D. Pa. Nov. 29, 2004))).

Undoubtedly, the public has a similar interest in judicial efficiency as the Court, which—as discussed above—weighs in favor of not staying this litigation. The nature of a particular litigation may also affect the public's interest in that litigation's resolution. *See, e.g.*, *Hakim*, 1993 WL 481335 at *3 ("The final consideration, the public interest, tips the scales against a stay, as the public interest in financial institutions promptly recovering misappropriated funds is significant, particularly when weighed against the interest in a merely conjectural criminal prosecution."); *State Farm*, 2002 WL 31111766 at *4 ("There is a public interest in having financial institutions

promptly recover misappropriated funds . . . . This is especially true in the instant case, as the cost of insurance fraud is eventually taken on by the public.").

Here—as discussed above—the nature of this case implicates unique health and welfare concerns for a significant portion of the population of the island of St. Croix, given that the CSAC contains allegations, *inter alia*, of "[i]ncidents [that] showered oil on local residents," which "contaminated and harmed the local water supply," deprived Plaintiffs of "the ability to safely use their cisterns for potable water," and "continue to be sources of hazardous substance emissions into, onto, within, and surrounding real property and personal property." (Dkt. No. 1327 at 5-6); *see also In re Flint Water Cases*, 2019 WL 5802706 at *3 (E.D. Mich. Nov. 7, 2019) (finding the sixth factor weighing against a stay because "[t]he injunctive and monetary relief sought in this case, if obtained, would provide relief to many thousands of Flint residents" affected by bacteria and lead leaching into the City of Flint's drinking water). Given the scale and magnitude of the allegations contained in the CSAC, the island of St. Croix has a public interest in the resolution of the claims asserted herein and the remediation of the hazardous substances that allegedly remain in the local water supply and in the land. *E.M.A. Nationwide, Inc.*, 767 F.3d at 629.

Accordingly, Moving Defendants have not carried their burden to demonstrate that the sixth factor—"the public interest," *Frantatoro*, 2023 WL 5605669 at *4—weighs in their favor.

## IV.   CONCLUSION

The Court finds that Moving Defendants have not met their burden to establish their "entitlement to" a stay in this civil case and finds that the circumstances of this litigation do not merit the "extraordinary remedy" of a stay in this civil case. *Deloitte Consulting*, 2023 WL 6037201 at *1. Moving Defendants have not demonstrated sufficiently that the six factors in the six-factor test weigh in favor of Moving Defendants. *Frantatoro*, 2023 WL 5605669 at *4.

Additionally, it is the Court's "studied judgment" as to the "particular facts before it" that a stay is not justified. *Louis Vuitton Malletier S.A.*, 676 F.3d at 99. In making that determination, the Court considered that Moving Defendants, as corporations, do not possess a Fifth Amendment privilege that can be implicated by these civil proceedings. *See E.M.A. Nationwide, Inc.*, 767 F.3d at 627. Further, neither the Moving Defendants nor their former employees have been indicted, nor does it appear that an indictment is "imminent[.]" *Maldanado*, 2018 WL 2561026 at *1-2. Further, given the duration of this litigation, the pending motions for preliminary approval of settlements, and the ongoing environmental damage alleged by Plaintiffs, Plaintiffs' interests in proceeding with this litigation are strong and they will be uniquely and significantly prejudiced by this requested stay.

In sum, Moving Defendants have not shown "that there is pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order." *E.M.A. Nationwide, Inc.*, 767 F.3d at 627-28. In view of the foregoing, the Court will deny Moving Defendants' Motion to Stay, and deny as moot Plaintiffs' Motion to Expedite.

An appropriate Order accompanies this Memorandum Opinion.

Dated: February 12, 2026                    _____/s/_____
                                            WILMA A. LEWIS
                                            Senior District Judge

32